**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>LOUIS DYER,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>     Plaintiff,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Case No.: PWG-16-521</td></tr>
<tr><td>ORACLE CORPORATION,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>     Defendant.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM OPINION AND ORDER**

After three years of working as an account manager for Defendant Oracle Corporation

("Oracle") and perceiving that his supervisor, Ken Jarrett, discriminated and retaliated against

him, Plaintiff Louis Dyer, a Black man from Haiti, filed suit against his employer, alleging race

and national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e *et seq.*; the Maryland Fair Employment Practices Act ("MFEPA"),

Md. Code. Ann., State Gov't §§ 20-601 *et seq.*; and Montgomery County Human Rights Law,

Montgomery Cnty. Code § 27-19.[1] Am. Compl. , ECF No. 15.  Oracle has moved to dismiss for

failure to state a claim. Def.'s Mot., ECF No. 22.[2]   Because Dyer has not alleged any

---

[1] Plaintiff alleges "employment discrimination and retaliation pursuant to the Maryland Annotated Code of 1957, art. 49B, §§ 16(a), 16(f) & 42(a)." Am. Compl. 1. In their joint letter to the Court narrowing the issues presented in the Amended Complaint, the parties note that "[a]lthough Plaintiff cites Article 49B of the Maryland Code in his Complaint, that law was repealed and in large part re-codified by §§ 20-101, *et seq.* of the State Govt. Article of the Maryland Code, eff. Oct. 1, 2009." May 11, 2016 Ltr. 1, ECF No. 20.  The subpart of the Maryland Human Relations Act, Md. Code. Ann., State Gov't §§ 20-101 *et seq.*, pertaining to employment practices is the MFEPA.

[2] Both parties have fully briefed the motion. ECF Nos. 22-1, 23, 24. A hearing is not necessary. *See* Loc. R. 105.6.

discriminatory conduct or statements that relate directly to any of the alleged adverse employment actions, or alleged facts from which this Court reasonably can infer that he received less favorable treatment than similarly-situated employees who are not Black or Haitian, I must dismiss his discrimination claims.  Dyer has stated valid claims for retaliation, however, and I will not dismiss those claims.

## Factual Background[3]

Oracle hired Dyer in December 2012 as a regional manager, following an interview with Jarrett that "focused on race and how Jarrett [a Black male] believed it was his mission at work to advantage black people."  Am. Compl. ¶¶ 9–10, 16.  Dyer and Jarrett's conflicts began in January 2013, when Dyer informed Jarrett and human resources that a Black female had accused Dyer of harassment, and Jarrett "was upset that Dyer had forwarded [the] email to human resources."  Id. ¶ 19.  Jarrett informed Dyer that "a black person does not report another black person to human resources," and repeatedly "threatened Dyer's job."  Id. ¶¶ 20–21, 23.  Jarrett also "undermined Dyer" and "excluded Dyer from team meetings and other deal discussions."  Id.  ¶¶ 27–29.  Dyer first complained to Jarrett's manager, Kevin Davis, about "Jarrett's discriminatory comments" in February 2013 and continued to complain about "Jarrett's retaliatory behavior" to Davis and human resources.  Id. ¶¶ 22, 29, 32.

Dyer became a Data Integration Solutions Representative/Area Sales Manager in June 2013 under the supervision of Davis, id. ¶ 33, but Jarrett became Dyer's supervisor once again in September 2014, when he replaced Davis, id. ¶ 36.  A couple weeks later, "Dyer contacted human resources via email to discuss his concerns about Jarrett being his manager again," stating

---

[3] At this stage of the proceedings, I accept the facts as alleged in Dyer's Amended Complaint as true.  See Aziz v. Alcolac, 658 F.3d 388, 390 (4th Cir. 2011).

that "he was concerned Jarrett would retaliate further." *Id.* ¶¶ 36–37.  Two months later, at

Dyer's "first one-on-one meeting with Jarrett as his new manager," Jarrett "tap[ed] the

conversation with his cell phone." *Id.* ¶ 38.  A month after that, at a meeting in which Jarrett

"introduced his leadership team and invited them to the front . . . to receive applause, . . . Dyer

was not called to the front." *Id.* ¶ 39.  Six weeks later, Jarrett informed Dyer that his sales

territory would be reduced by fifty percent, which Dyer alleged "negatively affected his

commissions because [he] expected several large deals." *Id.* ¶ 40.  In February 2015, Dyer

continued to contact human resources about Jarrett's perceived discrimination and retaliation, *id.*

¶¶ 41–42, and he "noted that $7,652 in commissions due to him was not paid because of the

change Jarrett made in Dyer's territory, *id.* ¶ 46.  His contact with human resources and an

investigator assigned to conduct an internal investigation continued through the spring, and in

June, "Jarrett sent an email formalizing the reduction in Dyer's territory and his demotion" from

"DIS Area Sales Manager" to "Account Manager." *Id.* ¶¶ 47–48.

In September 2015, Oracle's Vice President informed Dyer that "he would be moved

from directly reporting to Jarrett to working under another manager who reports to Jarrett." Am.

Compl. ¶ 54.  Dyer filed complaints with the EEOC and the Montgomery County Human Rights

Commission. *Id.* ¶¶ 55–56.  Finally, in January 2016, Dyer's direct supervisor denied an expense

report that Dyer submitted for a $265 "work-related hotel stay," stating that "he wanted to

approve the expense report but . . . Jarrett intervened and asked him to not approve the report."

*Id.* ¶ 59.

## **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it

fails to state a claim upon which relief can be granted."  *Velencia v. Drezhlo*, No. RDB-12-237,

2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012).  This rule's purpose "'is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).  To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6).  Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79; *see Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*).  Similarly, "unsupported legal allegations need not be accepted." *Nam v. 2012 Inc.*, No. DKC-15-1931, 2016 WL 107198, at *3 (D. Md. Jan. 11, 2016) (citing *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989)).

In an employment discrimination case such as this, the plaintiff "is not required to plead facts that constitute a *prima facie* case in order to survive a motion to dismiss," but "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15 (2002).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## <u>Discrimination</u>

Title VII proscribes discrimination by an employer based on race or national origin, 42 U.S.C. § 2000e–2(a), which a plaintiff ultimately may prove using direct evidence or under the

*McDonnell Douglas*[4] burden-shifting approach.  *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526–27 (D. Md. 2015), *aff'd as modified,* No. 15-2067, 2016 WL 4750626 (4th Cir. Sept. 13, 2016); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284 (4th Cir. 2004).  "Under either avenue of proof, the focus is on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision." *U.S. Equal Employment Opportunity Comm'n v. Dimensions Healthcare Sys.*, No. PX-15-2342, 2016 WL 4593470, at *3 (D. Md. Sept. 2, 2016) (citing *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 WL 5351448, at *6 (D. Md. Aug. 2, 2005), *aff'd*, 170 F. App'x 271 (4th Cir. 2006)). The *McDonnell Douglas* framework addresses what a plaintiff must prove to establish a *prima facie* case of discrimination, which, as noted, Dyer is not required to plead to survive Oracle's motion to dismiss.  Nonetheless, it must be plausible based on his factual allegations that he could prove his case.  *See Coleman*, 626 F.3d at 190.  The elements of a claim for race or national origin discrimination under Title VII, the MFEPA, or Montgomery County Human Rights Law[5] are "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) less favorable treatment than similarly situated employees

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[5] "The MFEPA 'is the state law analogue of Title VII.'"  *Royster v. Gahler*, 154 F. Supp. 3d 206, 215 (D. Md. 2015) (quoting *Alexander v. Marriott Int'l, Inc.*, No. RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 743 n.8 (Md. 2007)).  Additionally, "Maryland courts construe . . . claims [under the Montgomery County Human Rights Act] similarly to those made under Title VII." *Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *2 (D. Md. Feb. 4, 2016); *see Haas*, 914 A.2d at 756 (stating that, with regard to Title VII, MFEPA, and the Montgomery County Code provisions pertaining to unlawful employment practices, "it is appropriate to consider federal precedents when interpreting state and local laws"). Therefore, I will analyze Dyer's claims under federal, state, and local law together.

Oracle, similarly, noted that courts analyze these claims together and took the same approach.  *See* Def.'s Mem. 6 n.5.  Therefore, Dyer's request to deny Oracle's motion with regard to the local law claims based on what he perceived to be a failure by Oracle to "specifically address" these claims, Pl.'s Opp'n 11 n.1, is denied.  In its opposition, Dyer addresses only the Title VII and local law claims.

outside the protected class." *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *5 (D. Md. Sept. 28, 2011) (citing *White v. BFI Waste Servs.,* 375 F.3d 288, 295 (4th Cir. 2004)); *see also Coleman*, 626 F.3d at 190.

## Direct Evidence

"Direct evidence must be 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.' Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Va. Union Univ.,* 193 F.3d 219, 232 (4th Cir.1999) (en banc) (citation and internal quotation marks omitted)).   Stated differently, "[t]o constitute direct evidence, statements must be directly related to the employment decision in question" and must be "'the most blatant remarks, whose intent could be nothing other than to discriminat[e].'" *Betof v. Suburban Hosp., Inc.*, No. DKC-11-1452, 2012 WL 2564781, at *6 (D. Md. June 29, 2012) (quoting *Signal v. Gonzales*, 430 F. Supp. 2d 528, 541 n.5 (D.S.C. 2006) (citation omitted)).   The statement must be one that, "[i]f believed, . . . 'would prove the existence of a fact . . . without any inference or presumptions,'" such as an explicit statement "that an impermissible consideration was a determining factor." *Id.* (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (internal quotation marks omitted), *rev'd on other grounds*, 517 U.S. 308 (1996)).

The facts in *Price Waterhouse v. Hopkins* are illustrative.   490 U.S. 228 (1989), *superseded by statute on other grounds as stated in Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir. 1994).  There, Hopkins filed a sex discrimination suit after she was proposed, but not selected, for partnership at the accounting firm where she worked as a senior

manager. *Id.* at 231–33. The existing partners weighed in on the decision, and it was "Hopkins' perceived shortcomings in th[e] important area" of interpersonal relations that "doomed her bid for partnership," which was put on hold and then not reconsidered. *Id.* at 232, 234–35. The Supreme Court noted that "[t]here were clear signs" in the comments the partners provided "that some of the partners reacted negatively to Hopkins' personality because she was a woman," with "[o]ne partner describ[ing] her as 'macho'; another suggest[ing] that she 'overcompensated for being a woman'; [and] a third advis[ing] her to take 'a course at charm school.'" *Id.* at 235 (citations to record omitted). Additionally, when "[s]everal partners criticized her use of profanity . . . , one partner suggested that those partners objected to her swearing only 'because it's a lady using foul language.'" *Id.* (citation to record omitted). Of most significance was one partner's advice to Hopkins when he explained to her why her bid was on hold: "in order to improve her chances for partnership," he suggested that she "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" *Id.* (citation to record omitted). The Supreme Court concluded that these facts were sufficient direct evidence of sex discrimination, reasoning:

> Hopkins proved that Price Waterhouse invited partners to submit comments; that some of the comments stemmed from sex stereotypes; that an important part of the Policy Board's decision on Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way disclaimed reliance on the sex-linked evaluations.

*Id.* at 251.

According to Oracle, Dyer alleges no such facts in support of his claims. Def.'s Mem. 3. The employer contends that "there are no references to comments by Mr. Jarrett or anyone else referring to race or national origin in the context of any of the purportedly discriminatory actions, time-barred or otherwise." *Id.* at 4. Additionally, in Oracle's view, to the extent that Jarrett

made comments about race, "none of the comments . . . were derogatory toward blacks or Haitians." *Id.*

Dyer insists that "Oracle is mistaken," contending that Jarrett made "several . . . derogatory remarks about race to Dyer" in February 2013, such as that "Dyer was 'perpetuating the image of the black man as a sexual predator'"; that Dyer perhaps was "'not a good fit for the role'" (i.e., his position at Oracle), because he "did not understand 'the []black struggle in this country'"; and that Jarrett had "'seen things in this country [Dyer] ha[d]n't seen.'" Pl.'s Opp'n 12–13 (quoting . Am. Comp. ¶¶ 20, 21, 23). Dyer asserts that, although these acts are "time barred as discrete claims, they are relevant background information supporting Dyer's discrimination claims." *Id.* at 13–14. As he sees it, these statements are direct evidence that "reflect[s] Jarrett's discriminatory attitude and that directly relate to the adverse employment actions Dyer suffered." *Id.* at 14.

Significantly, the parties have agreed that no local law claims can be based on actions that occurred before January 30, 2014; no Title VII claims can be based on actions that occurred before November 18, 2014; and no MFEPA claims can be based on actions that occurred before March 15, 2015. May 11, 2016 Jt. Ltr. to Ct. 2, ECF No. 20. Dyer alleges that the following purportedly adverse employment actions that support his discrimination claim occurred after January 30, 2014: Jarrett recorded a meeting he had with Dyer on November 19, 2014, Am. Compl. ¶ 38; Jarrett "introduced his leadership team and invited them to the front" at a meeting on December 17, 2014, but "Dyer was not called to the front," *id.* ¶ 39; Jarrett informed Dyer on January 28, 2015 that "his territory would be reduced by half," a change that "negatively affected his commissions because Dyer expected several large deals," *id.* ¶ 40; Dyer was not paid "$7,652 in commissions due to him . . . because of the change Jarrett made in Dyer's territory," *id.* ¶ 46;

Jarrett changed Dyer's title from "DIS Area Sales Manager" to "Account Manager," *id.* ¶ 48; Jarrett gave the other half of Dyer's territory to "an African American employee who . . . is a member of a sorority that has ties to Jarrett's fraternity," *id.* ¶ 49; in a new "reporting structure" designed "to eliminate direct contact between Dyer and Jarrett," Dyer was "moved from directly reporting to Jarrett to working under another manager who reports to Jarrett," which he viewed as "effectively a demotion," *id.* ¶ 50, 54, 57; "per Jarrett's instructions," Dyer's manager refused to reimburse him for "a work-related hotel stay," *id.* ¶ 59.

Jarrett's February 2013 statements were made one year and nine months before the earliest alleged adverse employment action forming the basis for Dyer's discrimination claims. And, none of them references or relates to the later employment actions Oracle took. Therefore, regardless whether they reflect a discriminatory attitude, Dyer has failed to allege any connection between these temporally distant remarks in different contexts and any adverse employment action. *See U.S. E.E.O.C. v. CTI Global Solutions, Inc.*, 815 F. Supp. 2d 897, 907 (D. Md. 2011) ("Where the derogatory statement bears little relation to the contested employment action and is attenuated by time, a plaintiff will likely fail to satisfy the nexus requirement"); *see also Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (police chief's statement that he "'was never going to send a female to the Academy,'" made with regard to a female officer other than the plaintiff, was not direct evidence of sex discrimination even though it "reflect[ed] directly [the chief's] discriminatory attitude toward women," because it "obviously d[id] not 'bear directly on the contested employment decision,' i.e., Chief Wells' decision not to send Taylor to the Police Academy" (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995))), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Betof*, 2012 WL 2564781, at *6–7 (statements that employee was "implicated in other employees' EEOC complaints" and

"may have filed his EEOC complaint 'to hide [his] own culpability'" were not direct evidence of race discrimination because they were "facially race-neutral" and "there [was] no indication that [the] statements were in any way linked to [the employee's] subsequent termination," as they "occurred in a context separate from [the employee's] termination two days later"). Consequently, none of these statements is direct evidence of discrimination. *See Warch*, 435 F.3d at 520; *Taylor*, 193 F.3d at 232; *Betof*, 2012 WL 2564781, at *6–7; *CTI Global*, 815 F. Supp. 2d at 907.

*Less Favorable Treatment*

As noted, without direct evidence of discrimination, Dyer must include factual allegations that make it plausible that Oracle is liable for discrimination. *See Iqbal*, 556 U.S. at 678; *Coleman*, 626 F.3d at 190. This requires factual allegations that enable the Court to reasonably infer, *inter alia*, that Dyer received "less favorable treatment than similarly situated employees" who are not Black or Haitian. *See Linton*, 2011 WL 4549177, at *5; *see also Coleman*, 626 F.3d at 190. Oracle argues that, in this regard, Dyer's pleadings fall short. Def.'s Mem. 3, 6–7.[6] In support of its argument, Oracle identifies six allegedly adverse employment actions that Dyer describes in his Amended Complaint: an instance when Jarrett purportedly used his cell phone to record a meeting he had with Dyer; a meeting where Jarrett introduced his "leadership team" but did not include Dyer; a reduction in Dyer's sales territory; a failure to pay commissions; a change in whom Dyer reported to; and a refusal to reimburse Dyer for hotel expenses. *Id.* at 8–15. For each, Oracle contends that Dyer fails to allege that similarly-situated employees who were not Black or Haitian were not treated the same. *Id.*

---

[6] Because I agree with Oracle, I need not address its contention that Dyer also fails to allege sufficiently any adverse employment action.

Dyer counters:

> Jarrett initiated a pattern of discrimination and retaliation against Dyer after he
> learned that Dyer was [a] black man not of African-American descent whom he
> believed was not in agreement with Jarrett's racially-based socioeconomic
> theories and philosophies. Because these claims are individualized in nature and
> focused on Dyer, as evidenced by Jarrett's own racially-biased comments to Dyer,
> Dyer does not have to rely on broader assertions of differential treatment in the
> absence of such overt direct evidence of discrimination and retaliation.

Pl.'s Opp'n 18.   Thus, Dyer concedes that he has not shown less favorable treatment, arguing

instead that he sufficiently pleaded his claims by identifying direct evidence of discrimination,

*see id.*, which, as discussed, is not the case.   Consequently, Dyer has failed to plead facts that

"raise [his] right to relief above the speculative level" and therefore has failed to state a claim for

discrimination.[7]   *See Coleman*, 626 F.3d at 190.

## Retaliation

To state a claim for retaliation under Title VII, the MFEPA, or Montgomery County

Human Rights Law, a plaintiff must allege sufficiently that (1) he "engaged in protected

activity," (2) his employer "took adverse action against him," and (3) "a causal relationship

existed between the protected activity and the adverse employment activity."   *Price v.*

*Thompson,* 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds by Univ. of Texas Sw.*

*Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013); *see Mason v. Montgomery Cnty.*, No. PWG-13-

1077, 2015 WL 3891808, at *7 (D. Md. June 23, 2015).   Defendant challenges only the second

element—whether it took any adverse employment action.   *See* Def.'s Mem. 3.

In *Burlington Northern & Santa Fe Railway v. White*, the Supreme Court stated that "it is

important to separate significant from trivial harms," as "Title VII . . . does not set forth 'a

---

[7] Dyer has "acknowledge[d] and agree[d] that, because [he] has no further factual allegations to
support his claims other than those asserted in the Complaint, [he] will not seek leave to file a
Second Amended Complaint." May 11, 2016 Jt. Ltr. to Ct. 2.

general civility code for the American workplace.'"   548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)).   For purposes of a retaliation claim, what Title VII prohibits are actions by the employer that "a reasonable employee would have found . . . materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"   *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 491–92 (D. Md. 2013) (quoting *Madock v. McHugh*, No. ELH-10-2706, 2011 WL 3654460, at *26 (D. Md. Aug. 18, 2011) (quoting *Burlington N.*, 548 U.S. at 68 (citations and quotation marks omitted))).   Thus, a plaintiff cannot prevail on a retaliation claim based on "those petty slights or minor annoyances that often take place at work and that all employees experience," because "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."   *Burlington N.*, 548 U.S. at 68.

Yet, unlike for a discrimination claim, "[t]he adverse employment action in a retaliation case need not affect an employee's 'terms or conditions of employment.'"   *Madock*, 2011 WL 3654460, at *26 (quoting *Burlington N.*, 548 U.S. at 70).   Even with this lower bar, none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee "AWOL"; or issuing a personal improvement plan, "an 'Attendance Warning,' " a verbal reprimand, "a formal letter of reprimand," or "a proposed termination."   *Rock v. McHugh*, 819 F.Supp.2d 456, 470–71 (D. Md. 2011).   Nor is "[a] supervisor's refusal to invite an employee to lunch" materially adverse.   *Wonasue*, 984 F. Supp. 2d at 492 (quoting *Madock*, 2011 WL 3654460, at *26 (quoting *Burlington N.,* 548 U.S. at 69)). In contrast, "'excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement,' is conduct that 'might well' be materially

adverse." *Id.* (quoting *Madock*, 2011 WL 3654460, at *26 (quoting *Burlington N.,* 548 U.S. at 69)).

Significantly, in *Burlington Northern*, 548 U.S. at 69, the Supreme Court also recognized that "[c]ontext matters" in retaliation cases.  This means that, rather than considering each alleged adverse employment action in isolation, courts may "consider the cumulative effect of several allegedly retaliatory acts without converting the claim into a hostile work environment claim," and may  "consider whether 'based upon the *combined effect* of . . . alleged events, a reasonable worker could be dissuaded from engaging in protected activity.'" *Smith v. Vilsack*, 832 F. Supp. 2d 573, 585–86 (D. Md. 2011) (quoting *Test v. Holder*, 614 F. Supp. 2d 73, 84 (D.D.C. 2009) (citation omitted) (emphasis in *Test*)). "[R]etaliation may come in the form of a pattern of behavior, rather than a single discrete act." *Id.* at 586 (concluding that Smith could "rely on the collective retaliatory force" of "six discrete instances" of retaliation).

The parties discuss six instances of allegedly retaliatory conduct.  First, Jarrett recorded a meeting he had with Dyer on November 19, 2014 on his cell phone, Am. Compl. ¶ 38, and about a month later, he introduced his leadership team and had them go to the front of the room for applause at a meeting, but did not invite Dyer to the front, *id.* ¶ 39.  Six weeks after that, Jarrett informed Dyer that he was reducing his sales territory by half; Dyer alleges that this change that "negatively affected his commissions because Dyer expected several large deals." *Id.* ¶ 40.  And, Dyer alleges that he was not paid "$7,652 in commissions due to him . . . because of the change Jarrett made in [his] territory." *Id.* ¶ 46.  Then, on September 3, 2015, Dyer was "moved from directly reporting to Jarrett to working under another manager who reports to Jarrett," which he viewed as "effectively a demotion." *Id.* ¶¶ 54, 57.  Dyer also alleges that, in January

2016, "per Jarrett's instructions," his new manager refused to reimburse him for a $265 "work-related hotel stay." *Id.* ¶ 59.

It is unlikely that, taken in isolation, the recording of a one-on-one meeting and the failure to include Dyer with other employees who were recognized in a larger meeting would dissuade a reasonable employee from complaining about a supervisor's conduct. *See Wonasue*, 984 F. Supp. 2d at 491–92; *Madock*, 2011 WL 3654460, at *26. *Cf. Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 418 (D. Md. 2015) (concluding that reasonable juror could find that when, at a meeting, supervisor "publicly berated [employee] for filing an EEOC complaint" it amounted to an adverse employment action). These acts are better characterized as "petty slights, minor annoyances, and simple lack of good manners." *Burlington N.*, 548 U.S. at 68.

But, coupled with a fifty percent reduction in territory; two refusals to compensate Dyer when he believed he was entitled to compensation, once for more than $7,000; and a change in the reporting structure that left Dyer under Jarrett's indirect supervision but would require two promotions, rather than one, for Dyer to advance to Jarrett's position, the picture changes.[8]

---

[8] Oracle argues that "[c]ourts have held that modest immaterial changes to an employee's job such as a modification in territory or supervisor would not dissuade a reasonable person from engaging in protected activity." Def.'s Mem. 17. Oracle relies on *Chapman v. Geithner*, 2012 WL 1533514, at *22 (E.D. Va. 2012), *aff'd*, 507 F. App'x 299 (4th Cir. 2013), and *Linton*, 2011 WL 4549177, at *13. But, in both cases, the courts considered, not the sufficiency of the pleadings but whether the plaintiff presented a *prima facie* case of retaliation sufficient to survive the defendant's motion for summary judgment. *See Chapman*, 2012 WL 1533514, at *1; *Linton*, 2011 WL 4549177, at *13. The *Chapman* Court concluded that the plaintiff's "Title VII claims based on [*inter alia*] reassignment to new supervisors fail because Chapman has failed to show that these actions had a significant detrimental effect on her or her employment status or were otherwise materially adverse." *Id.* at *22. Reviewing the record, the court reasoned that Chapman's allegedly adverse "reassignment to remotely located supervisors" did not "require[] Chapman to relocate or impose[d] any significant change on her work." *Id.* Here, in contrast, the record has not been developed beyond the allegations in the Amended Complaint, and the change in Dyer's work assignment left him reporting to someone who, in turn, reported to Dyer's

Given this succession of events, during a time period in which Dyer repeatedly contacted human resources to complain about Jarrett and voice his concerns about retaliation, a reasonable jury could conclude that the cumulative effect of these actions might "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination" against his employer. *See Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710, at *3, *9 (D. Md. Aug. 28, 2012) (concluding that one plaintiff's "exclusion from weekly meetings for approximately six months" was not an adverse employment action, but "when considered cumulatively" with her allegations that two former supervisors told her new supervisor that she was a "troublemaker," and her new supervisor "'dredged up' . . . adverse reports" that had been "removed," the actions "constitute[d] material adversity under the objective standard"). Thus, taken together, these allegations sufficiently allege material adversity to withstand Defendant's motion to dismiss Dyer's retaliation claims. *See id.*; *Smith*, 832 F. Supp. 2d at 585–86.

### Hostile Work Environment

In his Opposition, Dyer refers to "consideration of the entire scope of a hostile work environment claim." Pl.'s Opp'n 14. But, Plaintiff's Amended Complaint only includes claims of discrimination and retaliation, not hostile work environment, Am. Compl. ¶¶ 61–84, and he does not seek leave to amend, *see* May 11, 2016 Jt. Ltr. to Ct. 2. An opposition to a dispositive motion is not a vehicle for amending a pleading. *See Whitten v. Apria Healthcare Grp., Inc.*, No.

---

former supervisor, which could pose a "significant change" to his opportunity for advancement, and half of the sales territory he formerly held was taken from him and given to his direct report, which also represented a "significant change" to his work. And in *Linton*, 2011 WL 4549177, at *13, while one of the two projects on which the plaintiff worked as project manager was reassigned, dividing the scope of her work similarly to Dyer's, there is no suggestion that her work was commission-based so that the reduction would affect her salary, as it could affect Dyer's. Additionally, the record in *Linton* revealed that the plaintiff "retained her title and job classification and received a $5,000 raise at the end of the year," facts that are not present in the pleadings in the case before me.

PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015).  Thus, to the extent Dyer seeks

to incorporate a hostile work environment claim into his existing pleadings, I will not consider it.

*See id.*

## **ORDER**

 Accordingly, it is, this 5th  day of December, 2016, hereby ORDERED that

1.  Defendant's Motion to Dismiss, ECF No. 22, IS GRANTED IN PART AND

   DENIED IN PART as follows:

   a.   Defendant's Motion to Dismiss IS GRANTED as to Plaintiff's discrimination

      claims, Counts I and III; and

   b.   Defendant's Motion  IS DENIED as to Plaintiff's retaliation claims, Counts II and

      IV; and

2.  Defendant's Answer IS DUE on or before January 6, 2017.


                                     _____/S/_____
                                     Paul W. Grimm
                                     United States District Judge



lyb